UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

JANET L. GANJE, on behalf of J.M.G.,

                             Plaintiff,

v.

DEPEW UNION FREE SCHOOL DISTRICT,

                             Defendant.
_____

**REPORT, RECOMMENDATION
AND ORDER**


11-CV-00665-RJA-JJM

       This case was referred to me by Hon. Richard J. Arcara for supervision of all

pretrial proceedings [10].[1]  Plaintiff commenced this action pursuant to the  Individuals with

Disabilities Education Act, 20 U.S.C. §§1400 *et. seq* ("IDEA") seeking, *inter alia*,

reimbursement for tuition for a minor child (J.M.G.) at the Gow School for the 2009-2010 (8th

grade) and 2010-2011 (9th grade) school years. Complaint [2].

       Before me are defendant Depew Union Free School District's motions for a

protective order ([21]) and for summary judgment [28].  Oral argument was held on June 13,

2012 [36].  For the following reasons, I order that the District's motion for a protective order be

granted, and I recommend that its motion for summary judgment be granted.

---

[1]      Bracketed references are to the CM/ECF docket entries.

## STATUTORY BACKGROUND

"To receive federal funding under the IDEA, states are required to provide disabled children with a 'free appropriate public education [("FAPE")].'" <u>T.P. ex rel S.P. v. Mamaroneck Union Free School District</u>, 554 F.3d 247, 252 (2d Cir. 2009) (*quoting* 20 U.S.C. §1412(a)(1)(A)). To meet this requirement, a school district must provide "special education and related services tailored to meet the unique needs of a particular child, and be 'reasonably calculated to enable the child to receive educational benefits.' . . . Such services must be administered according to an IEP [Individualized Education Plan], which school districts must implement annually." <u>Gagliardo v. Arlington Central School District</u>, 489 F.3d 105, 107 (2d Cir. 2007).

In New York, IEPs are developed by Committees on Special Education ("CSEs"), which are required to consider the following four factors in developing an IEP: "1) academic achievement and learning characteristics, (2) social development, (3) physical development, and (4) managerial or behavioral needs." <u>Id</u>. (*citing* 8 NYCRR §200.1(ww)(3)(i)). "In formulating an appropriate IEP, the CSE must also be mindful of the IDEA's strong preference for 'mainstreaming,' or educating children with disabilities '[t]o the maximum extent appropriate' alongside their non-disabled peers." <u>Id</u>. (*quoting* 20 U.S.C. §1412(a)(5)).

"[A] state IEP must be reasonably calculated to provide some 'meaningful' benefit". <u>Mrs. B. v. Milford Board of Education</u>, 103 F.3d 1114, 1120 (2d Cir. 1997). "[A] school district fulfills its substantive obligations under the IDEA if it provides an IEP that is 'likely to produce progress, not regression,' and if the IEP affords the student with an opportunity greater than mere 'trivial advancement.'" <u>Cerra v. Pawling Central School District</u>, 427 F.3d

186, 195 (2d Cir. 2005). However, a school district "is not . . . required to furnish 'every special service necessary to maximize each handicapped child's potential.'" Id. (*quoting* Board of Education of the Hendrick Hudson Central School District, Westchester County v. Rowley, 458 U.S. 176, 199 (1982)).

      "Parents who believe that the state has failed to provide such an education may pay for private services and seek reimbursement from the school district for 'expenses that it should have paid all along and would have borne in the first instance had it developed a proper IEP.'" T.P. ex rel S.P., 554 F.3d at 252 (*quoting* School Committee of the Town of Burlington, Massachusetts v. Department of Education of the Commonwealth of Massachusetts, 471 U.S. 359, 370-71 (1985)). "When the parents of a disabled child file suit under IDEA to challenge a state-proposed IEP and when the relief they seek includes reimbursement of expenses incurred at a private school, an award will be entered in their favor if it appears (1) that the proposed IEP was inadequate to afford the child an appropriate public education, and (2) that the private education services obtained by the parents were appropriate to the child's needs." Walczak v. Florida Union Free School District, 142 F.3d 119, 129 (2d Cir. 1998)(*citing* School Committee of the Town of Burlington, Massachusetts, 471 U.S. at 370).[2]

      In "New York . . . the burden 'of persuasion and . . . of production' [is] on local education agencies, 'except that a parent . . . seeking tuition reimbursement for a unilateral

---

[2]      Other cases apply "a three-step process to determine whether parents are entitled to tuition reimbursement" which also "consider[s] whether the school district has complied with the IDEA's procedural requirements." T.Y. v. New York City Department of Education, 584 F.3d 412, 417 (2d Cir. 2009), cert. denied, 130 S.Ct. 3277 (2010). However, plaintiff conceded at oral argument that there is no dispute that the District complied with the IDEA's procedural requirements.

parental placement' bears the burden of proof 'on the appropriateness of such placement.'" <u>J.S. v. Scarsdale Union Free School District</u>, 826 F.Supp.2d 635, 669 (S.D.N.Y. 2011) (*quoting* N.Y. Educ. Law §4404(1)(c) (McKinney 2007)).

"New York parents who disagree with their child's IEP may challenge it in an 'impartial due process hearing,' . . . before an IHO [impartial hearing officer] . . . . The resulting decision may be appealed to an SRO [a state review officer] . . . and the SRO's decision in turn may be challenged in either state or federal court". <u>Gagliardo</u>, 489 F.3d at 108. A district court reviewing the final administrative decision is entitled to "receive the records of the administrative proceedings," to "hear additional evidence," and to "grant such relief as the court determines is appropriate" based on "the preponderance of the evidence" before it. 20 U.S.C. §1415(i)(2)(C).

## FACTUAL BACKGROUND

J.M.G. is a minor child suffering from dyslexia, who resides within the District. Complaint [2], ¶¶1, 2. J.M.G. was enrolled in the District from kindergarten (2001-2002 school year) through June 2008 (6th grade). (<u>Id.</u>, ¶¶15, 18). In November 2004, plaintiff had J.M.G. evaluated by Mark Schachter, Ph.D., who determined that he had a "significant learning disorder". District Ex. 41, p. 3. At that time, J.M.G. achieved scores of 86 in word reading and 78 in reading comprehension, as measured by the Wechsler Individual Achievement Test, second edition ("WIAT-II"). November 8, 2010 Due Process Hearing, pp. 163-164.

The District's 2006-2007 IEP (5th grade) for J.M.G. noted that he was dyslexic and was reading at a 4th grade level. District Ex. 21, p. 3. During the 2006-2007 school year

J.M.G. was in a self-contained 15:1 special class setting. District Ex. 21. He earned final grades of 90 in English 5, 92 in Math 5, 91 in Science 5, and 92 in Social Studies 5. District Ex. 43. A March 20, 2006 evaluation prepared by the District's psychologist, M. Colleen McHale, M.Ed, C.A.G.S., indicated that J.M.G. achieved scores of 82 for reading composite (low average), 81 for word reading (low average), 93 for reading comprehension (average), and 79 for decoding (borderline), as measured by the WIAT-II. District Ex. 39, p. 2.[3]

The District's 2007-2008 IEP (6th grade) for J.M.G. noted that he "is currently about 2 years behind grade level and is reading at an independent level of a 2.2 according to the STAR reading test." District Ex. 15, p. 3.[4] Thus, it was noted that "he needs to have continuous support throughout his academic day with reading, word attack skills and decoding" (id.).[5] In 6th grade, he was no longer exclusively in a 15:1 special class setting (id.). Direct consultant teacher services were provided in Math, Science and Social Studies in a general education setting, but he continued to receive services in English Language Arts ("ELA") and special academic support in a 15:1 special class setting (id.). J.M.G. also received speech/language therapy twice a week for 30 minutes (id.), and "recently started using the Lindamood Phoneme Sequencing Program for Reading, Spelling, and Speech . . . to strengthen phonological awareness skills" (id., p. 3). While no assistive technology devices were recommended (id., p. 2), the District performed an augmentative communication and assistive technology evaluation in November 2007, which

---

[3]     Scores between 90 and 110 are considered average on the WIAT-II. District Ex. 39, p. 1.

[4]     The student's STAR reading scores fluctuated from a 2.2 grade equivalent in September 2006 (District Ex. 65), to a 2.9 grade equivalent in May 2007 (District Ex. 64), to a 2.4 grade equivalent in September 2007 ( District Ex. 62), to a 3.0 in May 2008. District Ex. 60.

[5]     Ms. Gajewski testified that "word attack" meant "[d]ecoding of the word". November 8, 2010 Due Process Hearing, p. 75.

recommended the Kurzweil 3000 "text to speech" program and accompanying hardware, to provide reading and writing support. District Ex. 32.

At the conclusion of the 2007-2008 school year J.M.G. earned final grades of 88 in English 6, 89 in Math 6, 90 in Science 6 and 90 in Social Studies 6. District Ex. 42. J.M.G. also achieved his IEP goals of increasing his reading coding skills to a 3rd grade level, spelling 10 basic sight words at the 4th grade level (District Ex. 45, pp. 2, 3), was progressing satisfactorily with his IEP goal of completing the components of the Lindamood Phoneme Sequencing Program (id., p. 2), and had made some progress toward the IEP goal of reading a passage at an appropriate grade level, putting it in his own words and stating the main idea of the passage (id., p. 3).

From 2006 though 2008, J.M.G. was tested annually as part of the New York State Testing Program ("NYSTP") and his scores in ELA consistently placed him at "Level 2", indicating that he was "partially meeting learning standards". District Exs. 29, 30. While he remained at Level 2, he consistently increased his score from a 616 in 2006, to a 626 in 2007, to a 639 in 2008. District Ex. 29.[6]

In July 2007, J.M.G. was evaluated by Michael Santa Maria, Ph.D., who measured his full scale IQ to be 102 ( District Ex. 36, p. 4), an increase of 10 points over the 92 score as measured by Dr. Schachter in 2004. District Ex. 41, p. 2. Dr. Santa Maria assessed J.M.G. as being in the "low average, 2.9 grade level" for reading fluency and to be in "average, 5.7 grade

---

[6]     A score of 650 was required to attain the delineation of meeting learning standards (Level 3). District Ex. 30.

level" for writing fluency (id., p. 4).[7]  Dr. Santa Maria also found that while J.M.G. suffered from

dyslexia, "his weaknesses in reading  and writing are relatively focal", meaning that "most of the

cognitive abilities are very much intact" and that "[h]e is of normal range overall intellectual

functioning" (id., p. 7).  Dr. Santa Maria considered J.M.G.'s  "academic program to be well

geared to his needs" (id., p. 8).

      Although the District's CSE developed an  IEP for the 2008-2009 school year

(District Ex. 12),[8] the IEP was never implemented because plaintiff unilaterally enrolled J.M.G.

at the Gow School for the 2008-2009 school year (seventh grade).  Complaint [2], ¶30. Weiss

Declaration [28-1], ¶47. The 2008-2009 IEP added certain assistive technology devices,

including access to a computer and noted that the student uses the Kurzweil program to assist

with reading, writing, and word prediction.  District Ex. 12, p. 2.  The District continued to

develop IEPs for J.M.G., but he remained at the Gow School. Complaint [2],  ¶46.


### The 2009-10 IEP

      The  2009-10 IEP (District Ex. 7) further mainstreamed J.M.G. into the general

education setting with the support of a consultant teacher, which would allow him to pursue a

Regents diploma.  November 8, 2010 Due Process Hearing,  pp. 108-109.  The IEP was

developed by the CES  following a meeting on August 20, 2009 with various District personnel,

Jeff Sweet of the Gow School, and plaintiff.  District Ex. 7, p. 5.  The CES recommended that

---

[7]    These scores were measured using the Woodcock-Johnson III test ("WJ-3").

[8]    The District's Exhibits from the administrative proceeding are maintained in paper form.

plaintiff receive 1) consultant teachers in English, Math, Science, and Social Studies (40 minutes/day - five days/week); 2) speech and language consultation; 3) a variety of accommodations, including being provided with copies of all class notes and the use of a calculator; 4) "[a]ccess to Computer" throughout the school day; 5) "Academic Support for all four content areas"; and (6) "[r]eading everyday in a small group setting". District Ex. 7, pp. 1-2. The IEP also noted that J.M.G. "uses the Kurzweil 3000 computer based program when necessary at school and at home to assist with reading, writing, and word prediction", and that there would be "training [for staff] on Kurzweil - info for dyslexia" (id., p. 2).

### The 2010-11 IEP

In addition to the recommendations contained in the 2009-2010 IEP, the 2010-2011 IEP added recommendations for a "5-1" resource room (40 minutes/day - 5 days/week) and a laptop computer. District Ex. 4, pp. 1-2.

### The Due Process Hearing

Plaintiff served a Due Process Hearing Request on the District in August 2010, seeking tuition reimbursement for the 2008-2009, 2009-2010 and 2010-2011 school years. Complaint [2], ¶32. IHO Mindy Wolman conducted a hearing at which the District presented the testimony of Janet Gajewski, the District's Director of Special Education, and Christie Maryanski and Tracy Malush, J.M.G's special education teachers in the District. IHO's Findings of Fact and Decision [2-1], p. 6. Plaintiff testified on her own behalf, along with three members of the Gow School: Jeffrey Sweet, Kathleen Rose, and Mari Jo Renick (id., p. 7).

Ms. Gajewski testified that she was a certified special education teacher with 21 years of experience prior to becoming the District's Director of Special Education five years earlier. November 8, 2012 Due Process Hearing, pp. 46-47, 165. Although Ms. Gajewski had no specific training in working with dyslexics, the District's literacy support teachers were reading specialists with certifications in reading, Alyssa Quintilone, a teacher in the District, attended a program on dyslexia, a number of reading specialists and special education teachers in the District had obtained Orton-Gillingham certifications, and the speech pathologist, Rosy Ryan, had obtained a Lindamood-Bell certification (id., pp. 166-169). Ms. Gajewski testified that teaching strategies and methodologies are not set forth in the IEP, since they are left to the teachers working with the student (id., p. 211).

According to Ms. Gajewski, based upon his success in all of his classes in the District, J.M.G. was on track to receive a Regents diploma (id., pp. 61-62). Even though J.M.G. was the first student in the District to use the Kurzweil program, Ms. Gajewski testified that there was a staff member trained in the Kurzweil program at that time (id., pp. 151-152, 184). Other than Dr. Santa Maria's evaluation, Ms. Gajewski conceded that the District did not obtain an evaluation as to what kind of reading disability J.M.G. suffered from (id., p. 165).

Ms. Maryanski testified that she was a New York State certified special education teacher who was J.M.G.'s ELA teacher in 5th and 6th grade, but did not have any specific training with dyslexic students beyond what she learned as part of her special education degree and Kurzweil training. November 9, 2010 Due Process Hearing, pp. 286-288, 337. She received training in 2006-2007 with the Kurzweil program (id., pp. 289-290). According to Ms. Maryanski, the scanning of materials into the Kurzweil program was not difficult, and they

taught J.M.G. to do it (id., pp. 290-291). Even if the materials could not be scanned before

class, it would take approximately five minutes to do so (id., p. 292). If J.M.G. needed materials

for home, they would be scanned in at the end of the day (id., pp. 293-294). However, Ms.

Maryanski was informed by plaintiff that she was having difficulty scanning J.M.G.'s textbooks

and conceded that there were problems with the printing and scanning associated with the

program (id., pp. 339-340, 344). She was also aware that plaintiff was spending several hours

each evening working with her son (id., p. 340).

Ms. Malush, a certified special education and elementary education teacher,

testified that she was J.M.G.'s 6th grade consultant teacher (id., pp. 357-358). Beyond her

special education degree, Ms. Malush attended a dyslexia conference the year that she taught

J.M.G. in order to "learn more about [him] and his specific needs", and also "did a lot of reading

and research" on her own so that she could help him (id., pp. 373-374). As the consultant

teacher, she provided individualized instruction to the students and assisted J.M.G. with his

reading (id., p. 359).

Mr. Sweet, the director of the middle school at the Gow School, testified that the

Gow School is an all-boys boarding school for students with language based learning difficulties

(id., pp. 380-381). He testified that one of the "dominant features" of the Gow School is its

Reconstructive Language Program (id., pp. 383, 389). In the last five years, the Gow School has

also started a laptop program that utilizes the Kurzweil program (id., pp. 390-391). The Gow

School maintains a database of books for the Kurzweil program that were obtained in digital

form or have been scanned (id., p. 391). According to Mr. Sweet, J.M.G. has a "pretty severe"

disability, but "[h]is reading development is coming along", testing now at the fourth or fifth grade level (id., pp. 395-396).

Ms. Rose, the department chair of the Reconstructive Language Program at the Gow School, testified that the Reconstructive Language program is "very similar" in content to the Orton-Gillingham program (id., pp. 408-409). In her opinion, J.M.G. was "making steady and good progress" while attending the Gow School (id., p. 422).

Dr. Renick, the director of research and assessment at the Gow School, testified that J.M.G. suffers from double-deficit dyslexia (deficits in both rapid naming and phonological processing), which is "an excellent match" for the Reconstructive Language Program (id., pp. 425-428). When asked whether J.M.G. would have experienced the same progress without attending the Gow School, she testified that "given the severity of his dyslexia and the double-deficit aspect of it, he does need an environment that is as structured and intensive as Gow is, and so . . . without that intensity, he would not make as much progress" (id., p. 435). According to Dr. Renick, it may take an individual with double-deficit dyslexia longer to achieve their goals (id., p. 445). She also testified that she would not recommend using the Fast ForWord program with J.M.G. (id., p. 439-441).

Dr. Renick testified that there was not a significant difference between the March 2006 WIAT-II score of 82 for reading composite (District Ex. 39, p. 2) and the decreased score of 78 J.M.G. achieved in January 2010 (District Ex. 28, p. 2), while he was attending the Gow School. November 9, 2010 Due Process hearing, p. 439. Dr. Renick was also unable to attribute the decrease to the District or the Gow School (id.).

Plaintiff testified that she took J.M.G. to Dr. Schachter for testing in first grade and that his first IEP was implemented in the second grade (id., p. 455). Dr. Schachter recommended to plaintiff that she look outside of the District for additional help for her son (id., p. 457), prompting her to enroll J.M.G. in a University of Buffalo reading program and the Gow School summer program in the 4th, 5th and 6th grades (id., p. 458-460). According to plaintiff, J.M.G. would display improvement in the summer while attending the Gow School and then "slowly decline" when he resumed attending school in the District (id., pp. 460-461). While he attended classes in the District, she worked extensively with J.M.G. during the evenings (id., pp. 461-464, 493-494). J.M.G. struggled with the Fast ForWord program and encountered problems with the Kurzweil program while attending the District since there was often insufficient time during the school day for J.M.G. to scan in materials, thereby necessitating that he scan materials at home (id., pp. 465-466, 473, 480, 482-483). While she conceded that the District's "teachers certainly did try to give him the one-on-one that he needed", she did not "think it was enough for [her son]" (id., p. 472). When he first started at the Gow School "he could barely read a few sentences or a few words" (id., p. 490).

## The IHO's Decision

On April 24, 2011, IHO Wolman issued her Findings of Fact and Decision [2-1], concluding that plaintiff's claims for the 2008-09 school year were time-barred,[9] that plaintiff was entitled to reimbursement of tuition for the unilateral placement of the Student for the 2009-10 school year, and that plaintiff was not entitled to reimbursement for the 2010-11 school year.

---

[9] This aspect of the IHO's decision was not appealed. Complaint [2], ¶34.

In concluding that the 2009-2010 IEP was not reasonably calculated to allow meaningful education progress, IHO Wolman found that J.M.G. "need[ed] some level of small group special education instruction in a separate location in order to address his reading and writing deficits" and that the elimination of speech/language therapy contained in the 2008-2009 IEP "was not warranted and constituted a reduction in services that would decrease the likelihood of J.M.G. making meaningful educational progress". [2-1], pp. 11-12. She further concluded that J.M.G. experienced "a steady pattern of progress during [his] 2009-2010 attendance at Gow", and that "[w]hile Gow was a more restrictive program than necessary in that J.M.G. did not require a residential placement", the placement "was not so restrictive as to preclude tuition reimbursement" (id., p. 13).

However, IHO Wolman concluded that the District's 2010-11 IEP was reasonably calculated to allow J.M.G. to make meaningful educational progress, noting that "[t]he daily resource room services would have enabled J.M.G. to receive the reading instruction in a small group setting that had been lacking in the 2009-2010 IEP", and that he had "benefitted from [the instruction at the Gow School] and made substantial progress in reading and writing" (id., p. 14).

**The SRO'S Decision**

On appeal, SRO Justyn Bates reversed that portion of the IHO Wolman's decision that granted plaintiff's application for reimbursement for the 2009-10 school year, and affirmed that portion of her decision that denied plaintiff's application for reimbursement for the 2010-10 school year [2-2]. In rejecting IHO Wolman's determination that the 2009-2010 IEP was not reasonably calculated to allow J.M.G. to make meaningful educational progress, SRO Bates

disagreed with the IHO's conclusion that the IEP was deficient for failing to incorporate some level of small group special education instruction to address J.M.G.'s reading and writing deficits. The SRO relied on the District's testimony that "based on the student's success in his previous programs, [it was] believed that the student was ready to try a consultant teacher model" and that IEP "was designed to allow the student to be in the mainstream environment . . . , but provide the student with the support of the special education teacher" (id., p. 11).

SRO Bates also noted that "[d]uring the August 2009 CSE meeting, the director of special education explained to all CSE participants that the student's reading needs in phonetic awareness would be identified on the IEP, as would his recommended special education services; that the student would receive reading instruction in small group academic support time; and that academic instructional support (AIS) would be noted on the IEP, but the specifics of such instruction would not appear on the student's IEP under 'program and services' because it was a general education service available to both disabled and non-disabled students" (id.). While not reflected in the IEP, according to the transcript of the August 2009 CSE meeting, the District indicated that if "the student needed 1:1 reading instruction, it would look to schedule him with the AIS teacher, who was also a special education teacher by training" (id.).

He also disagreed with the IHO's determination that the IEP was deficient in speech and language services, concluding that "[a]lthough the August 2009 CSE recommended a less restrictive manner of delivery of speech-language therapy than it did for the 2008-09 school year, its recommendation for indirect speech-language consultation services for the 2009-10 school year expanded the reach of the related service from the therapy room to the student's

teachers in his classroom settings, and was consistent with the student's academic and

management needs as described in his . . . 2009 IEP" (id., p. 12).


**The Litigation**

Plaintiff commenced this case pursuant to the IDEA, seeking a "modified de novo

review" of the SRO's decision (Complaint [2], p. 11, Wherefore Clause), and asserting causes of

action for breach of duty under the IDEA (id., ¶¶47-51, First Cause of Action) and for negligence

(id., ¶¶52-58, Second Cause of Action).  A Case Management Order ([13]) was implemented

setting a fact discovery cut-off of February 13, 2012 (id., ¶6).  Following an informal conference

with the parties in January 2012, I directed ([20]) the parties to file motions (if any) relating to the

need to comply with plaintiff's First Set of Interrogatories dated November 28, 2011.  Weiss

Declaration [21-1], Ex. A.

The District filed a  motion for a protective order seeking to strike plaintiff's First

Set of Interrogatories.[10]  These interrogatories seek three categories of information: 1) information

concerning the teachers, staff and administration overseeing learning disabled students and the

individuals responsible for administering standardized testing for the Depew Middle School from

2004 to 2011 and for the Depew High School for 2007 through present (Weiss Affidavit [21-1],

Ex. A, Nos. 2-6, 21-23); 2) information concerning the continuing education programs required

for special education teachers, the programs offered and/or required by the District to provide

---

[10]        While plaintiff has asserted independent causes of action, she appears to concede that the
discovery sought is only relevant, if at all, to her challenge to the SRO's decision.  Plaintiff's
Memorandum of Law [24], p. 2 ("In order to determine whether the evidence adduced at the Hearing
upon which the SRO relied was based on a full and complete record . . . Plaintiff's counsel . . .  served a
First Set of Interrogatories upon Defendant").

advanced training in the identification and teaching of students with dyslexia, and current teachers having received training in programs recognized by the International Dyslexia Association (id., Nos. 21-23); and 3) information concerning the diagnosed dyslexic students in the District for the school years 2005 to present, including the number of students that graduated and attended four year colleges (id., Nos. 10-16).[11]

While the District's motion for a protective order was pending, it filed a motion for summary judgment [28]. During oral argument of the District's motion for a protective order, the parties agreed that the motion would be addressed in conjunction with the District's summary judgment motion through a Fed. R. Civ. P. ("Rule") 56(d) application [31]. Plaintiff has since filed her response to the District's motion for summary judgment, which includes an application pursuant to Rule 56(d) ([32, 33]) for additional discovery to oppose the District's motion. [12]

## ANALYSIS

### A.    The District's Motion for Summary Judgment

#### 1.    Summary Judgment Standard

"Motions for summary judgment customarily resolve IDEA actions in federal court." C.L. v. Scarsdale Union Free School District, 2012 WL 983371, *7 (S.D.N.Y. 2012). "Summary judgment in this context involves more than looking into disputed issues of fact; rather, it is a 'pragmatic procedural mechanism' for reviewing administrative decisions." A.C. ex

---

[11]    Prior to the District's motion, plaintiff withdrew Interrogatory Nos. 1, 7-9, 17-20, and 24-25. Weiss Declaration [21-1], Ex. K.

[12]    Plaintiff has incorrectly delineated her application as being made pursuant to Rule 56(f).

rel. M.C. v. Board of Education of The Chappaqua Central School District, 553 F.3d 165, 171 (2d Cir. 2009).  Thus, "[u]nder the IDEA, unlike in the usual case, the existence of a disputed issue of fact will not defeat the motion."  Scarsdale Union Free School District,  2012 WL 983371 at *7.

### 2.    Plaintiff's IDEA Claim

### a.    IDEA Framework

In reviewing educational decisions under the IDEA, the court "must engage in an independent review of the administrative record and make a determination based on a 'preponderance of the evidence'".  Cerra, 427 F.3d at 191-192.  Nevertheless, "'the role of the federal courts in reviewing state educational decisions under the IDEA is circumscribed.' . . . 'While the district court must base its decision on the preponderance of the evidence, it must give due weight to the administrative proceedings, mindful that the judiciary generally lacks the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy.'"  T.Y. v. New York City Department  of Education, 584 F.3d at 417.

"[T]he 'preponderance' review . . . 'is by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review.' . . . Requiring the federal courts to defer to the findings of the state administrative proceedings ensures that the federal courts do not 'impos[e] their view of preferable educational methods upon the States.'"  Muller on Behalf of Muller v. Committee on Special Education of East Islip Union Free School District, 145 F.3d 95, 101 (2d Cir. 1998) (quoting Rowley, 458 U.S. at 206-207); Karl by Karl v. Board of Education of Geneseo Central School District, 736 F.2d 873, 877 (2d Cir. 1984) ("[F]ederal courts defer to the final decision of the state authorities, and

that deference may not be eschewed merely because . . . the reviewing authority disagrees with the hearing officer"); Bougades v. Pine Plains Central School District, 376 Fed.Appx. 95, 99 (2d Cir. 2010)(Summary Order) (The court "need not determine whether [it] would have adopted the same educational program in the first instance. It is enough to say that because the IEP is supported by the record, the IHO and SRO's conclusions-and the notions of sound educational policy upon which those conclusions are premised-are entitled to deference").

Thus, "federal courts reviewing administrative decisions must give 'due weight" to these proceedings". Gagliardo, 489 F.3d at 112 (*quoting* Rowley, 458 U.S. at 206 ("we find nothing in the Act to suggest that merely because Congress was rather sketchy in establishing substantive requirements, as opposed to procedural requirements for the preparation of an IEP, it intended that reviewing courts should have a free hand to impose substantive standards of review which cannot be derived from the Act itself"). "Where, as in our case, the IHO and SRO disagree, the general rule is that 'courts must defer to the reasoned conclusions of the SRO as the final state administrative determination.' . . . Therefore, a court must defer to the SRO's decision on matters requiring educational expertise unless it concludes that the decision was inadequately reasoned, in which case a better-reasoned IHO opinion may be considered instead." R.E. v. New York City Department of Education, __ F.3d __, 2012 WL 4125833, *16 (2d Cir. 2012). With this standard in mind, I will address the District's motion.[13]

_____

[13]     While the District has submitted a Rule 56 statement of undisputed facts in support of its motion, which "may assist the court in reviewing particular issues, it is not in and of itself dispositive". T.Y. v. New York City Department of Education, 584 F.3d at 418.

**b.      Was J.M.G. Denied a FAPE?**

Plaintiff argues that "in recent years school districts and significantly impartial hearing officers and state review officers, have rubber stamped IEPs, with all the right boxes checked, disregarding the actual facts concerning the student."  Plaintiff's Memorandum of Law [33], p. 6.  Whether or not that may have occurred in other cases, it did not occur here: the record makes clear that this was anything but a cursory review of the IEP.  Not only did the IHO find in favor of plaintiff with respect to the 2009-10 IEP,  it is evident that both her determination and that of the SRO, although conflicting, were reached following a thorough review and analysis  of the evidence. "[D]eference is particularly appropriate where, as here, the SRO's review has been thorough and careful."  Matrejek v. Brewster Central School District, 471 F.Supp.2d 415, 418 (S.D.N.Y. 2007), aff'd,  293 Fed.Appx. 20 (2d Cir. 2008).

Beyond this generalized argument, plaintiff argues that the District "does not provide any reading specified program", which "above all else, renders the SRO wrong and the IEP a failure in terms of providing a FAPE for this student."  Plaintiff's Memorandum of Law [33], p. 16.  I disagree.  Reading services were a component of both the 2009-10 and 2010-11 IEPs. Ms. Gajewski, the District's Director of Special Education, testified that the student would be receiving reading instruction in ELA, in the literacy support group, in the resource room, and in the other content areas where he received consultant teacher services. November 8, 2010 Due Process hearing, pp. 120-121.[14]

Although IHO Wolman concluded that the 2009-10 IEP was deficient for not including "some level of small group special education instruction in a separate location in order

_____

[14]      A 5:1 resource room was added as part of the 2010-11 IEP. District Ex. 4, p. 1.

to address his reading and writing deficits" ([2-1], p. 11), SRO Bates explained that this was erroneous ([2-2], pp. 11-12), as the 2009-10 IEP specifically stated that J.M.G.'s services would include "[r]eading everyday in a small group setting" (District Ex. 7, p. 2). Although it was not listed on the IEP because it was a general education service available to learning disabled and non-learning disabled students, SRO Bates also noted that J.M.G. would receive literacy support through a general education reading support class. [2-2], p. 11; November 8, 2010 Due Process hearing, pp. 51, 110. Likewise, he noted that J.M.G. would be provided with individualized tutoring in reading from the AIS teacher, who was a trained special education teacher, if necessary. [2-2], p. 11.

       "[P]arents must have sufficient information about the IEP to make an informed decision as to its adequacy prior to making a placement decision". <u>R.E. v. New York City Department of Education</u>, __ F.3d __, 2012 WL 4125833 at *12. Therefore, an "IEP must be evaluated prospectively as of the time of its drafting and . . . retrospective testimony that the school district would have provided additional services beyond those listed in the IEP may not be considered". <u>Id.</u> However, since both of these resources were discussed during the August 20 2009 CSE meeting (District Ex. 9, pp. 13, 17-18, 28) at which plaintiff was present and the IEP was developed, I conclude that SRO Bates did not err by considering these resources. *See* <u>M.C. v. Katonah/ Lewisboro Union Free School District</u>, 2012 WL 834350, *9 (S.D.N.Y. 2012) ("parent was aware of the availability of building level services, and the fact that such services were not explicitly specified in the IEP did not interfere with parent's ability to judge the appropriateness of NC's educational plan").

Plaintiff further argues that J.M.G. required "at minimum, an intensive, daily 5:1 reading class separate and apart from any other support services" (plaintiff's Memorandum of Law [33], p. 14), and that the "reading program must be specialized and identified to work for students with severe neurological, language based disabilities, such as dyslexia" (id., p. 14). "However, '[p]arents . . . do not have a right under the IDEA to compel a school district to provide a specific program or employ a specific methodology' in educating their child." L.K. v. Department of Education of the City of New York, 2011 WL 127063, *11 (E.D.N.Y. 2011) (quoting Lachman v. Ill. State Board of Education, 852 F.2d 290, 294-97 (7th Cir.1988)). Plaintiff also argues that "[t]he District provided no evidence that the teachers who would be available in the consultancy support role had any proficiency in the subject matter." Plaintiff's Memorandum of Law [33], p. 15. However, the proper inquiry is not whether the teachers were trained in teaching dyslexic students, but rather "whether the staff is able to implement the IEP". S.H. ex rel. W.H. v. Eastchester Union Free School District, 2011 WL 6108523, *12 (S.D.N.Y. 2011) ("S.H. also contends that the District's program is inappropriate because none of the CHS staff is trained to work specifically with students with attachment disorders. The proper inquiry is whether the staff is able to implement the IEP"); L.K. v. Department of Education of the City of New York, 2011 WL 127063 at *11 ("Though Plaintiffs continue to assert that the staff at Shema Kolainu did not have specific training in severe autism and 1:1 ABA teaching techniques, there is no indication that the teachers were not adequately trained to implement the IEP").

New York State requires that "[w]hen a remedial service is included in the individualized education program, such service shall be provided by appropriately certified or licensed individuals" (8 NYCRR §200.6(b)(1)), but there is no argument by plaintiff or evidence

in the record that J.M.G's teachers were not properly licensed. To require anything beyond this would "usurp state educational standards and policy" by "re-writ[ing] state teaching certification requirements in the guise of applying the IDEA." Hartmann by Hartmann v. Loudoun County Board of Education, 118 F.3d 996, 1004 (4th Cir. 1997), cert. denied, 522 U.S. 1046 (1998).

Much of the dispute here appears to center on plaintiff's disagreement with the type of programs that were suited to address J.M.G.'s dyslexia. At the hearing, Ms. Gajewski testified that while J.M.G. had progressed in the self-contained model, the District "felt that the consultant teacher model provided even more supports with expertise in the content area." November 8, 2010 Due Process hearing, pp. 108-109. She also testified that the CSE recommended that J.M.G. use the Fast ForWord Program, a methodology to assist dyslexic students (id., pp. 67, 173-174). Significantly, Dr. Santa Maria concluded that J.M.G.'s "academic program [was] well geared to his needs". District Ex. 36, p. 8.

By contrast, Dr. Renick of the Gow School testified that she would not recommend the Fast ForWord program for remedial reading. November 9, 2010 Due Process hearing, pp. 439-441. Instead, the "dominant feature" of the Gow School is its Reconstructive Language Program, which was a "really nice match" for J.M.G.'s double-deficit dyslexia (id., pp. 383, 427-429). Unlike the District's approach of mainstreaming the student under the consultative teacher model, the Gow School was a boarding program for students with language-based learning disabilities, with an average 1 teacher to 4 students per class (id., pp. 381, 387-388).

It is impermissible for me to select "between the views of conflicting experts on a controversial issue of educational policy-effective methods of educating dyslexic students - in

direct contradiction of the opinions of state administrative officers who had heard the same evidence".  Grim v. Rhinebeck Central School District,  346 F.3d 377, 383 (2d Cir. 2003); C.B. v. Pittsford Central School District, 2010 WL 1533392, *15 (W.D.N.Y. 2010) (Siragusa, J.) ("'That privately hired experts recommended different teaching methodologies for [the child] does not undermine the deference the Court must pay to the District.'" *quoting* Watson v. Kingston City School District, 142 Fed.Appx. 9, 10, 2005 WL 1791553, *1 (2d Cir. 2005)(Summary Order)).

        Moreover, even if I were conclude that the Gow School offered better programs for J.M.G., that would not render the District's IEP inadequate.  "[S]chool districts 'need not provide the optimal level of services, or even a level that would confer additional benefits, since the IEP required by IDEA represents only a 'basic floor of opportunity'".  Cerra, 427 F.3d at 195 (*quoting* Carlisle Area School v. Scott P.*, 62 F.3d 520, 534 (3d Cir.1995)). While it is understandable that, as a parent, plaintiff would seek the best services available to her son, the IDEA does not guarantee an education "'that provides everything that might be thought desirable by loving parents.'" Walczak, 142 F.3d at 132.  *See* Antonaccio v. Board of Education of Arlington Central School District,  281 F.Supp.2d 710, 725 -26 (S.D.N.Y. 2003) ("The Antonaccios understandably seek the optimal education for their son, and they believe that teaching him using the Orton–Gillingham approach on a one-to-one basis at Pine Ridge is best for Alex. But the IDEA does not require a school district to 'maximize the potential of a handicapped child'", *quoting* Rowley, 458 U.S. at 197 n. 21); M.M. ex rel. C.M. v. School Board of Miami-Dade County, Fla., 437 F.3d 1085, 1102 (11th Cir. 2006) ("The dispute in this case boils down to the parents' belief

that AVT is the program best suited to provide C.M. with a quality education. However, under the IDEA there is no entitlement to the 'best' program").

Plaintiff also argues that "[a] complete examination of the facts and data show that throughout the time that J.M.G. attended the District, he made no 'meaningful progress' as required by case law and statute." Plaintiff's Memorandum of Law [33], p. 14. I disagree. There is sufficient objective evidence in the record supporting the SRO's determination. "Although past progress is not dispositive, it does 'strongly suggest that' an IEP modeled on a prior one that generated some progress was 'reasonably calculated to continue that trend.'" S.H. ex rel. W.H. v. Eastchester Union Free School District, 2011 WL 6108523, *10 (S.D.N.Y. 2011)(*quoting* Thompson R2–J School District v. Luke P. ex rel. Jeff P., 540 F.3d 1143, 1153 (10th Cir. 2008)). "[W]hen a learning-disabled child is in a mainstream class, 'the attainment of passing grades and regular advancement from grade to grade' will generally constitute evidence of satisfactory progress." Cerra, 427 F.3d at 196. "Of course, a child's academic progress must be viewed in light of the limitations imposed by the child's disability." Mrs. B. v. Milford Board of Education, 103 F.3d at 1121.

J.M.G. obtained satisfactory grades while attending the District. For example, in the 2006-07 school year, he earned final grades of 90 in English 5, 92 in Math 5, 91 in Science 5, and 92 in Social Studies 5. District Ex. 43. Despite the shift in the 2008-09 IEP to mainstreaming parts of the student's program (District Ex. 15), he continued to achieve consistently satisfactory final grades, which included 88 in English 6, 89 in Math 6, 90 in Science 6 and 90 in Social Studies 6. District Ex. 42.

Faced with this objective evidence, and recognizing that "[a]n assessment of educational progress is a type of judgment for which the district court should defer to the SRO's educational experience, particularly where, as was the case here, the district court's decision was based solely on the record that was before the SRO", M.S. ex rel. S.S. v. Board of Education of the City School District of the City of Yonkers, 231 F.3d 96, 105 (2d Cir. 2000), cert. denied, 532 U.S. 942 (2001), I see no reason to set aside the SRO's determination that J.M.G. would have continued to meaningfully progress under the 2009-10 and 2010-11 IEPs.

Plaintiff further argues that while "the District claimed that results on standardized tests which showed minuscule increase on the part of the student, were evidence of meaningful progress . . . Dr. Mari Jo Renick, an expert in the area of testing, made clear that these results were not even within the standard deviation and were not being interpreted correctly." Plaintiff's Memorandum of Law [33], p. 8. However, this claim is not borne out by the referenced testimony of Dr. Renick. Dr. Renick testified that there was not a significant difference between the March 2006 WIAT-II score of 82 for reading composite (District Ex. 39, p. 2) and the decreased score of 78 J.M.G. achieved in January 2010 while J.M.G. was attending the Gow School (November 9, 2010 Due Process hearing, p. 439), not that the District was interpreting its tests results incorrectly (District Ex. 28, p. 2). Dr. Renick was also unable to attribute the decrease to the District or the Gow School (id.).

I recognize that the record does contain certain standardized tests for reading, which could suggest that J.M.G. was not progressing under the District's tutelage. For example, as part of the Gow School's August 11, 2008 admissions assessment, he scored between a 2.2 and 2.7 grade equivalent in the Gray Oral Reading Test (4th Ed.) (plaintiff Ex. DD), which was

similar to his measured reading level in the 2007-08 IEP. District Ex. 15, p. 3 ("He is currently about 2 years behind grade level and is reading at an independent level of 2.2 according to the STAR reading test").

However, the record *did* contain other objective evidence indicating that J.M.G. was progressing while attending the District. For example, his NYSTP ELA scores consistently increased (District Ex. 29), his STAR reading score increased from a 2.2 grade equivalent in September 2006 (District Ex. 65) to a 3.0 grade equivalent in May 2008 (District Ex. 60),[15] which Ms. Gajewski testified represented that J.M.G. was progressing (November 8, 2010 Due Process hearing, pp. 77, 90, 203), and his grades remained good throughout this period (District Ex. 42). *See* Cerra, 427 F.3d at 195 ("In order to avoid impermissibly meddling in state educational methodology, a district court must examine the record for *any objective evidence* indicating whether the child is likely to make progress or regress under the proposed plan" (emphasis added)).

Plaintiff's extensive reliance on Nein v. Greater Clark County School Corporation, 95 F.Supp.2d 961 (S.D.Ind. 2000) does not compel a different conclusion. Plaintiff's Memorandum of Law [33], pp. 15-16. In Nein, the school had used the Milestones Program[16] beginning in the second grade to assist the dyslexic student with his reading skills. 95 F.Supp.2d at 966. However, "[a]s a fourth grader, . . . and after three years of Greater Clark's special

_____

[15]     These scores are similar to the April 21, 2006 testing performed by the University of Buffalo Center for Literacy and Reading Instruction, which measured J.M.G. as reading at a 2.2 grade level (District Ex. 68, p. 3) and Dr. Santa Maria's July 17, 2007 testing, which measured his reading fluency at a 2.9 grade level (District Ex. 36, p. 4).

[16]     "The Milestones Program is a reading series based on a limited vocabulary. It is designed for use with students who have learning disabilities." Nein, 95 F.Supp.2d at 966.

education services supposedly tailored to address [his] needs, he still could not read. He could not even read signs to know which public restroom he should use. Moreover, tests indicated that his IQ had dropped an astonishing 20 points, from 95 to 75. There is much more evidence, of course, but those points are symptoms of the problem here." Id. at 963. Despite the lack of any progress over the past three years, the school "again proposed to use the same teaching methods if Lucas had stayed there for fifth grade." Id. at 972. While the school relied upon the student's grades and advancement from grade to grade to show progress, the court found these to be hollow benchmarks for education advancement, since the school had a "policy of not retaining students at a particular grade level" and graded the student on a modified scale. Id. at 977-978.

Given these circumstances, which the court described as "extreme", it overturned an administrative ruling in favor of the school, noting that the student "made no transferable progress in three years [from kindergarten through fourth grade], and where there was no indication the public school was ready and able to change direction, the limits of 'due weight' and judicial deference to school authorities have been exceeded." Id. at 975.

By contrast to the facts in Nein, in this case there is no evidence that J.M.G's grade-to-grade advancement and academic grades were not indicators of his progress. And, even if one were to conclude that J.M.G. was making no progress, it cannot be said that the District was unwilling to modify his academic services to address his needs.

Plaintiff argues that whatever progress J.M.G. made while a student in the District was attributable to her efforts at "home schooling" him. Plaintiff's Memorandum of Law [33], p. 9. I disagree. "Although some [of the student's] progress could have been attributable to in-home instruction, there was no showing that [his] progress was 'in large part' brought about by this

private instruction, rather than the IEP." MM ex rel. DM v. School District of Greenville County, 303 F.3d 523, 533 n.13 (4th Cir. 2002).

Plaintiff further argues that SRO Bates failed to "balanc[e] what was on the IEP with the testimony and evidence concerning the actual student's progress", in that he "incorrectly interpreted the extent of technological support and the value of services such as resource room, and failed to acknowledge or account for the testimony specifically describing how these services were inadequate to meet the needs of this specific student"; 2) "completely ignored compelling evidence that the District had failed to properly assess and evaluate the Student's level of competency and progress"; 3) "only gave weight to the vague and self-serving testimony offered by the District, which failed to provide any impartial, non-prejudicial review of the skill level of the Student prior to his unilateral placement"; and 4) overlooked testing establishing that the student was diagnosed as "severely dyslexic". Plaintiff's Memorandum of Law [33], p. 7.

These arguments are likewise misplaced. Plaintiff's challenges directed at the extent of technological support available for the Kurzweil program and value of services such as the resource room are in essence challenges to whether the IEPs would have been appropriately implemented. However, "[s]peculation that the school district will not adequately adhere to the IEP is not an appropriate basis for unilateral placement". R.E. v. New York City Department of Education, __ F.3d__, 2012 WL 4125833 at *21. *See* Peter G. v. Chicago Public School District No. 299 Board of Education, 2003 WL 121932, *19 (N.D.Ill. 2003) ("This court acknowledges that plaintiffs have raised some valid concerns about Peter's placement at Blaine and whether Ms. Purcell's training program will prove to be adequate. However, Peter only actually stayed at Blaine for 15-20 minutes before his mother removed him. The Blaine staff was not given any fair

opportunity to even attempt to work with Peter or utilize any sign language; this court can only speculate as to whether the sign language training would have been sufficient").[17]  In any event, the 2009-2010 and 2010-2011 IEPs, included training for staff on the use of the Kurzweil program. District Ex. 4, p. 2; Ex. 7, p. 2.

Likewise, the record does not indicate that the District failed to properly evaluate and assess J.M.G.  "In developing the IEP, a CSE is required to 'review existing evaluation data on the child, including (i) evaluations and information provided by the parents of the child; (ii) current classroom-based, local, or State assessments, and classroom-based observations; and (iii) observations by teachers and related services providers.'" S.F. v. New York City Department of Education, 2011 WL 5419847, *10 (S.D.N.Y. 2011) (*quoting* 20 U.S.C. §1414(c)(1)(A)).  There is no indication that this did not occur with respect to either IEP, which reference the evaluations upon which the CSE relied.  The record is also devoid of any evidence that these evaluations and assessments were not proper.

While plaintiff now challenges whether the District properly assessed J.M.G.'s disability, the SRO noted that the "parent did not dispute the accuracy of the district's assessment of the student's deficits" ([2-2], pp. 1, 9).  *See* J.N. v. Depew Union Free School District, 2008 WL 4501940, *4 (W.D.N.Y. 2008) (Curtin, J.) (failure to raise a claim at administrative hearings

_____

[17]      In support of its argument that "[w]here it is clear that a student will not be educated pursuant to a proposed IEP, it is well settled that there can be no denial of a [FAPE] due to the failure to implement it",  the District cites to E.H. v. Board of Education of Shenendehowa Central School District, 2008 WL 3930028, *10 (N.D.N.Y. 2008), aff'd, 361 Fed. Appx. 156 (2d Cir. 2009), cert. denied, 130 S.Ct. 2064 (2010) and Grim v. Rhinebeck Central School District, 346 F.3d 377, 382 (2d Cir. 2003).  District's Reply Memorandum of Law [34], p. 4 n. 12.   However, these cases addressed the lack of prejudice resulting from delays in formulating IEPs that are ultimately not implemented, which is distinguishable from the circumstances presented here.

precludes district court review under the IDEA). Moreover, there is no indication that the severity of J.M.G.'s impairment was ignored in the IEP, which noted that he had "significant delay in decoding [and] reading comprehension", or by the SRO, who specifically acknowledged the Gow's School's diagnosis of dyslexia and a disorder of written expression in making his determination.

The fact that plaintiff has pointed to parts of the record not specifically discussed by the SRO does not render the opinion deficient. *See* S.F. v. New York City Department of Education, 2011 WL 5419847, *13 (S.D.N.Y. 2011) ("Neither the IHO nor the SRO discussed the substantive appropriateness of the IEP itself, as distinguished from the Placement Classroom. But it is clear from an independent review of the record that the IEP includes all the required components under the IDEA . . . and that it was based on and incorporated the detailed evaluations, observations and other information provided by the Parents and MMFS").

Therefore, based on the record currently before me, I conclude that the District is entitled to summary judgment on plaintiff's IDEA claim.[18]

3.     **Plaintiff's Negligence Claim**

The District argues that plaintiff's claim for negligence is "essentially . . . a cause of action for educational malpractice, a claim not cognizable under the law." District's Memorandum of Law [28-2], p. 2, n. 1. Plaintiff does not respond to this argument.

---

[18]     Given this conclusion, I need not address whether the Gow School was an appropriate placement.

"Where the essence of the complaint is that the school breached its agreement by failing to provide an effective education, the complaint must be dismissed as an impermissible attempt to avoid the rule that there is no claim in New York for "educational malpractice." Gally v. Columbia University, 22 F.Supp.2d 199, 207 (S.D.N.Y. 1998). *See* Hoffman v. Board of Education of City of New York, 49 N.Y.2d 121, 125 (1979)("although plaintiff's complaint does not expressly so state, his cause of action sounds in 'educational malpractice'. Plaintiff's recitation of specific acts of negligence is, in essence, an attack upon the professional judgment of the board of education grounded upon the board's alleged failure to properly interpret and act upon Dr. Gottsegen's recommendations and its alleged failure to properly assess plaintiff's intellectual status thereafter. . . . [S]uch a cause of action, although quite possibly cognizable under traditional notions of tort law, should not, as a matter of public policy, be entertained by the courts of this State"); Butler v. South Glens Falls Central School District, 106 F.Supp.2d 414, 422 (N.D.N.Y. 2000). Therefore, I recommend dismissal of this claim.

I will next address whether plaintiff should be permitted to conduct discovery in order to present additional evidence in opposition to the District's motion for summary judgment.

**B.** **The District's Motion for A Protective Order and Plaintiff's Rule 56(d) Application**

Rule 56(d) generally permits additional discovery where necessary to gather additional facts "essential to justify the party's opposition" to a summary judgment motion, if the movant "file[s] an affidavit describing: (1) what facts are sought and how they are to be obtained; (2) how these facts are reasonably expected to raise a genuine issue of material fact; (3) what efforts the affiant has made to obtain them; and (4) why the affiant's efforts were unsuccessful".

Gualandi v. Adams, 385 F.3d 236, 244 (2d Cir. 2004). However, as discussed above, this analysis is modified under the IDEA framework, in which summary judgment does not turn on whether there are triable issues of fact. Additionally, in the IDEA context, plaintiff does not have an automatic right to present additional evidence .

While the IDEA states that the court "shall" hear additional evidence, "[t]he general consensus is that the IDEA's 'additional evidence' provision is limited, and the decision of whether to allow additional evidence is discretionary with the district court". Handleman v. Board of Education of Penfield Central School District, 2007 WL 3076970, *3 (W.D.N.Y. 2007) (Telesca, J.). "[A] court should receive additional evidence at the judicial review stage of an IDEA proceeding only if the movant provides a particularized and compelling justification for doing so. This showing should include an explanation both as to why the evidence was not presented at the administrative level and why it is probative of the issues before the court." Id. at *5.

The court must also "be careful not to allow such evidence to change the character of the hearing from one of review to a trial *de novo*." Town of Burlington v. Department of Education for the Commonwealth of Massachusetts, 736 F.2d 773, 791 (1st Cir. 1984), aff'd, 736 F.2d 773 (1985).[19] By way of example, the reasons for supplementation "might include gaps in the administrative transcript owing to mechanical failure, unavailability of a witness, an improper

---

[19]     "Although the Second Circuit has yet to define the precise contours of the IDEA's additional evidence provision, the Court believes that the Second Circuit would adopt the *Burlington* standard because it represents the approach adopted by a majority of those Circuits deciding the issue." Handleman, 2007 WL 3076970 at *3.

exclusion of evidence by the administrative agency, and evidence concerning relevant events occurring subsequent to the administrative hearing".  Id. at 790.

Plaintiff argues that she was not permitted discovery at the due process hearing to explore the underlying facts for District's claims regarding the adequacy of its programs, and that "[t]hroughout the Due Process Hearing, the District made unsubstantiated claims regarding its ability to provide a FAPE for this student . . . .  without any detailed, supporting evidence." Plaintiff's Memorandum of Law [24], p. 5.  She argues that "[w]ithout the requested discovery items, Plaintiff will be deprived of the detailed data necessary to disprove the District's conclusory assertions regarding the adequacy of its programs" (id., p. 5).

The District responds that "[t]here was nothing preventing Plaintiff from requesting that information during the hearing"(District's Reply Memorandum of Law [26], p. 4) and that the "request for discovery is merely a fishing expedition, using 'the federal court proceeding to patch up holes in [the] administrative case.'" (id., p. 3 *quoting* A.S. and W.S. v. Trumbull Board of Education, 359 F.Supp.2d 102, 105 (D. Conn. 2005)).  According to the District, plaintiff could have requested the District's records, including teacher qualifications, pursuant to the Freedom of Information Act, New York Public Officers Law, and the No Child Left Behind Act of 2001 (id.).

While plaintiff argues that the "IDEA is silent on the issue of discovery at . . . the administrative level" (plaintiff's Memorandum of Law [24], p. 6), she does not argue that she requested and was refused discovery at that level.  In any event, I conclude that plaintiff has not established that the information she seeks would constitute "additional evidence" relevant to the issues before me.  Plaintiff does not argue that the  information she seeks  is due to gaps in the

administrative transcript owing to mechanical failure, due to the unavailability of a witness, due to the improper exclusion of evidence by the IHO or the SRO, or is evidence concerning relevant events that occurred subsequent to the administrative hearing. *See* Town of Burlington, 736 F.2d at 790.

Instead, it appears to me that plaintiff is attempting to "'use the federal court proceeding to patch up holes in [her] administrative case.'" A.S. v. Trumbull Board of Education, 359 F.Supp.2d 102, 105 (D.Conn.2004) (*quoting* Springer v. Fairfax County School Board, 134 F.3d 659, 667 (4th Cir. 1998) ("A lenient standard for additional evidence would have the consequence of making the whole IDEA process more time consuming, as parties scrambled to use the federal court proceeding to patch up holes in their administrative case. Whether this lengthy process would serve students is doubtful at best")).

In order to oppose the District's motion for summary judgment, plaintiff seeks discovery concerning teacher qualifications, whether the tests were administered and evaluated by personnel who were properly qualified, the suitability of programs available to J.M.G. after he left the District, and the number of students meeting J.M.G's profile attending the District, including the District's success with these students. McCallion Affirmation [32], ¶¶10, 12, 13, 19. However, none of this discovery is relevant to these issues before me.

According to plaintiff, "the degree of *experience and expertise that the district has with the specific type of disability* with which a student presents . . . is highly relevant to the issue of whether the district . . . does, in fact, have the requisite 'know-how' to provide an individualized educational plan for a particular student". Plaintiff's Memorandum of Law [24], p. 8 (emphasis added). *See* McCallion Affirmation [32], ¶10 ("plaintiff requests much greater

information on the education and background of the traders who would be responsible for the administration of the IEP").  However, as discussed above, rather than examining a teacher's experience with a particular disability, "[t]he proper inquiry is whether the staff is able to implement the IEP".  S.H. ex rel. W.H. v. Eastchester Union Free School District, 2011 WL 6108523 at *12 (rejecting plaintiff's argument "that the District's program is inappropriate because none of the CHS staff is trained to work specifically with students with attachment disorders"); L.K. v. Department of Education of the City of New York, 2011 WL 127063 at *11 ("Though Plaintiffs continue to assert that the staff at Shema Kolainu did not have specific training in severe autism and 1:1 ABA teaching techniques, there is no indication that the teachers were not adequately trained to implement the IEP.  Gili Recajny, the director, is a board certified behavioral analyst with a degree from Columbia University").

Plaintiff's desire to obtain discovery concerning  the District's success in educating other student's with similar disabilities is likewise irrelevant to resolving the claim before me. "[T]he ultimate inquiry in an IDEA case is whether the IEP is appropriate for the individual student. . . .  [A] hearing officer (or reviewing court) cannot conclude that a proposed IEP is appropriate for a given student simply because similar IEPs were appropriate for other students. To do so would eliminate the individualized inquiry that is at the heart of the IDEA." County School Board of Henrico County, Virginia v. Z.P. ex rel. R.P., 399 F.3d 298, 308 (4th Cir. 2005).

Plaintiff also argues that she "cannot respond adequately to claims made by the District on the suitability of programs being offered to the student after he has departed from the District."  McCallion Affirmation [32], ¶13.  By example, plaintiff points out that "the District puts great weight on their new and improved special education programs in both technology and

reading however Plaintiff has no way of measuring the veracity of that claim without specific discovery responses on the programs themselves, the methodology incorporated to determine those programs and the validity of those programs as measured against students with similar disabilities" (id.).

However, as discussed above, plaintiff has not offered anything other than mere speculation that the District's teachers would not be able to implement the IEP. *See* Peter G. v. Chicago Public School District No. 299 Board of Education, 2003 WL 121932 at *19. Moreover, as discussed above, plaintiff was provided with an ample opportunity to probe the IEP at the due process hearing. Therefore, I grant the District's motion for a protective order and deny plaintiff's Rule 56(d) application.

## CONCLUSION

For these reasons, the District's motion for protective order [21] is granted, and I further recommend that its motion for summary judgment [28] likewise be granted.

Unless otherwise ordered by Judge Arcara, any objections to this Report, Recommendation and Order must be filed with the clerk of this court by October 15, 2012 (applying the time frames set forth in Rules 6(a)(1)(C), 6(d), and 72(b)(2)). Any requests for extension of this deadline must be made to Judge Arcara. A party who "fails to object timely . . . waives any right to further judicial review of [this] decision". Wesolek v. Canadair Ltd., 838 F. 2d 55, 58 (2d Cir. 1988); Thomas v. Arn, 474 U.S. 140, 155 (1985).

Moreover, the district judge will ordinarily refuse to consider *de novo* arguments, case law and/or evidentiary material which could have been, but were not, presented to the magistrate judge in the first instance. Patterson-Leitch Co. v. Massachusetts Municipal Wholesale Electric Co., 840 F. 2d 985, 990-91 (1st Cir. 1988).

The parties are reminded that, pursuant to Rules 72(b) and (c) of this Court's Local Rules of Civil Procedure, written objections shall "specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for each objection . . . supported by legal authority", and must include "a written statement either certifying that the objections do not raise new legal/factual arguments, or identifying the new arguments and explaining why they were not raised to the Magistrate Judge".  Failure to comply with these provisions may result in the district judge's refusal to consider the objections.


Dated:   September 26, 2012

/s/ Jeremiah J. McCarthy
JEREMIAH J. MCCARTHY
United States Magistrate Judge